IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN ARTHUR DUVAL,<br><br>Defendant. | Cause No. CR 01-62-BLG-SPW<br><br><br><br>ORDER |

Defendant John Arthur Duval was sentenced in this Court on October 22, 2002. *See* Minutes (Doc. 189). He moves to reduce his sentence under 18 U.S.C. § 3582(c)(1)(A), commonly called the "compassionate release" provision.

A jury convicted Duval of drug trafficking and firearms offenses. The guideline range for these offenses was 168 to 210 months. For conspiring to manufacture methamphetamine, possessing methamphetamine with intent to distribute it, and manufacturing methamphetamine (Counts 1, 2, and 3), he was sentenced to 120 months in prison. For being a fugitive in possession of two firearms (Count 6), and for being a felon in possession of each of the same two

1

firearms (Counts 8 and 9), he was sentenced to serve 90 months, consecutive.  His terms on these counts totaled 210 months in prison.

The jury also convicted Duval on two counts of possessing a firearm in furtherance of drug trafficking, violations of 18 U.S.C. § 924(c) (Counts 4 and 5). The controlling statutes at the time and a 1993 Supreme Court decision mandated a prison term of at least five years on Count 4 and at least 25 years on Count 5, with those terms running consecutive to each other and also to the other counts. *See* 18 U.S.C. § 924(c)(1)(A), (C)(i), (D)(ii) (eff. Nov. 13, 1998); *Deal v. United States*, 508 U.S. 129, 136 (1993).

Duval's total sentence, therefore, is 570 months, or 47½ years. *See* Judgment (Doc. 190) at 2.  He has been in custody since his arrest in Colorado on September 5, 2001. *See* Warrant Return (Doc. 3).  His currently projected release date is August 16, 2042. *See* Inmate Locator, http://www.bop.gov/inmateloc (accessed Dec. 9, 2022).

## I. Legal Framework for Sentence Reductions

A sentencing court may reduce a sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i).  If such reasons exist, then the court must also consider the sentencing factors in 18 U.S.C. § 3553(a) "to the extent that they are applicable."  *Id.*; *see also United States v. Keller*, 4 F.4th 1278, 1284 (9th Cir. 2021) (per curiam).

2

## A. The First Step Act's Amendment of § 3582(c)(1)(A)

Before passage of the First Step Act of 2018 ("FSA" or "the Act"), only the Director of the Bureau of Prisons was authorized to file a motion in the sentencing court requesting the prisoner's "compassionate release." The Act implemented two important changes. First, it authorized prisoners to file motions on their own behalf, so that they need not persuade the Director to file motions for them. Second, the Act imposed an exhaustion requirement. A prisoner must ask the Bureau of Prisons ("BOP") to file a motion for him before he may file one himself. He need not await BOP's final response, but he cannot file until at least 30 days have passed since he asked the warden of his facility to file a motion for him. *See* 18 U.S.C. § 3582(c)(1)(A); First Step Act, Pub. L. No. 115-391, tit. VI, § 603(b)(1), 132 Stat. 5194, 5239 (Dec. 21, 2018); *Keller*, 4 F.4th at 1282.

To obtain a reduction, a prisoner or the Director must show either that "extraordinary and compelling reasons warrant such a reduction," *see* § 3582(c)(1)(A)(i), or that the prisoner is at least 70 years old, has served at least 30 years, and is no longer a danger, *see* § 3582(c)(1)(A)(ii).[1] Only subsection (i) is at

---

[1] The statute provides that any reduction must be consistent with the "applicable" policy statement in the Sentencing Guidelines. *See* 18 U.S.C. § 3582(c)(1)(A); 28 U.S.C. § 994(a)(2)(C), (t). The applicable guideline, U.S.S.G. § 1B1.13 (Nov. 1, 2018), begins with the phrase, "Upon motion of the Director of the Bureau of Prisons." The Ninth Circuit and most others allow district courts to take the guideline into account when a prisoner files a motion to reduce the sentence, but they hold that it is binding only when the Director files the motion. *See United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021) (per curiam).

3

issue here.

Section 3582(c)(1)(A)(i) does not define or cabin the phrase "extraordinary and compelling reasons."[2]  Although motions under § 3582(c)(1)(A) are commonly called "compassionate release" motions, these words do not appear in the statute. The statute does not require "release" or a reduction to time served.

The First Step Act, by contrast, *does* use the phrase "compassionate release." Section 603(b) of the Act is titled "Increasing the Use and Transparency of Compassionate Release."[3]  Section 603(b) contains three subsections.  Subsection (1) authorizes prisoners to file motions.  Subsection (2) is a conforming, relettering amendment.  Subsection (3) imposes detailed notification and assistance obligations on BOP to alert families of prisoners diagnosed with a terminal illness, or who are mentally or physically unfit, of the option of filing a motion to reduce the sentence.  BOP must also facilitate visitation, process requests for reduced sentences rapidly, and help prisoners or their families to file motions.  Subsection

---

[2] U.S.S.G. § 1B1.13 defines the phrase as including a terminal medical condition; a physical or mental condition substantially diminishing the prisoner's ability to function in prison; a particular combination of age, deterioration in physical or mental health, and time served; certain family circumstances when the prisoner is the only caregiver; or other reasons "[a]s determined by the Director of the Bureau of Prisons." U.S.S.G. § 1B1.13 cmt. n.1.  Under *Aruda*, a sentencing court may reduce the sentence even when these criteria are not met.

[3] Titles and subsection headings "cannot limit the plain meaning of the text," but they are "tools available for the resolution of a doubt about the meaning of a statute." *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (internal quotation marks and citations omitted).

(3) also imposes annual reporting requirements on BOP to track motions, the grounds for making them, who submitted them, what the outcome was, and the like. *See* FSA § 603(b)(1)–(3), 132 Stat. at 5239–41.

Sections 601 and 602 of the Act direct BOP to prioritize family ties and to increase the use of home confinement in deciding where to place prisoners. Sections 604 through 613 concern preparation for release, vocational opportunities, de-escalation training for correctional officers, treatment for opioid and heroin abuse, mentorship and service programs, supervision of released sex offenders, collection of information about prisoners, and special needs of female prisoners and juveniles. *See* First Step Act §§ 604–613, 132 Stat. at 5239–49.

In sum, the context of Congress' amendment of § 3582(c)(1)(A) in Title VI of the First Step Act, authorizing prisoners to file "compassionate release" motions, strongly suggests a focus on *extralegal* considerations—medical and mental conditions, age, and family connections. A focus of this nature is also consistent with Congress' imposition of an exhaustion requirement in § 3582(c)(1)(A), as all of these considerations generally fall within BOP's sphere of concern. These matters appear to encapsulate the traditional role of § 3582(c)(1)(A) and the reason it is referred to as the "compassionate release" provision.

5

## B.  The First Step Act's Amendment of 18 U.S.C. § 924(c)

In a different title of the First Step Act, Congress revisited the Supreme Court's 1993 decision in *Deal*.  Deal was indicted and convicted of six armed bank robberies but had no previous conviction under § 924(c).  At sentencing, he argued that § 924(c) should be read to apply the longer penalty on each subsequent conviction only after a first conviction for violating § 924(c) became final.  Had he been correct, his total sentence under § 924(c), apart from his convictions for any of the robberies, would have been five years, consecutive, for each of the six counts, or 30 years.

The Supreme Court rejected Deal's argument and affirmed his 105-year[4] sentence. *See Deal*, 508 U.S. at 136.  Because the Court held that § 924(c) sentences pile up in this way in the course of a single proceeding, § 924(c)(1)(C) is commonly called "the stacking provision."

In the First Step Act, Congress amended the statute to adopt the approach the Supreme Court rejected in *Deal*.  Section 924(c) now provides that the extended penalties apply "after a prior conviction" under § 924(c) "has become final."  18 U.S.C. § 924(c)(1)(C) (eff. Dec. 21, 2018); FSA § 403(a), 132 Stat. at 5221.  Following pre-amendment jargon, the amendment is commonly called "the

---

[4] At the time of Deal's conviction, the penalty for a second or subsequent conviction under § 924(c) was "only" 20 years, rather than the 25 years it is now.

6

anti-stacking provision" of the Act.  Before the anti-stacking amendment, a

defendant charged with three violations of § 924(c) would face a mandatory

minimum sentence of 55 years—60 months plus 300 months plus 300 months.

The same defendant charged today with exactly the same conduct in violation of §

924(c) would face a mandatory minimum sentence of 15 years—60 months plus 60

months plus 60 months.

One more provision of the First Step Act is relevant to § 924(c).  Congress

decreed that the anti-stacking amendment applies only to persons sentenced on or

after the Act's effective date, December 21, 2018.  *See* FSA § 403(b), 132 Stat. at

5222.[5]  Whatever Congress's reason for this limitation, it is fair to say that myriad

plea bargains and sentencing packages have rested on *Deal* since 1993, and

applying the anti-stacking amendment retroactively could not take account of

individual cases.  Section 403(b) does not in any terms authorize or contemplate a

second look at sentences imposed before its effective date.

For Duval, the bottom line is clear.  He was sentenced long before December

21, 2018.  Section 403 does not authorize a reduction of his sentence.

---

[5]  The text of § 403(b) refers to "amendments," but the title of § 403 is "Clarification of
Section 924(c) of Title 18, United States Code."  That is, the section appears to state what
Congress (at least the December 2018 Congress) believed § 924(c) meant all along, "clarifying"
§ 924(c) directly contrary to *Deal*'s 25-year-old precedent.

Ironically, the majority and the dissenters in *Deal* agreed the statute was unambiguous.
*See id.* at 132 (Scalia, J., for the majority); *id.* at 141 (Stevens., J., dissenting).  But each thought
it obviously meant the opposite of the other's interpretation.

### C.   May Congress's Amendment of § 924(c) Be an Extraordinary and Compelling Reason to Reduce Duval's Sentence?

Because the amended § 924(c) penalties do not apply to Duval, he emphasizes the broad discretion that § 3582(c)(1)(A)(i) gives sentencing courts. Tying sections 403 and 603 of the FSA together, he contends that the anti-stacking amendment, and the disparity it creates between offenders sentenced for violating § 924(c) before and after its effective date, *is* an extraordinary and compelling reason to reduce his sentence under § 3582(c)(1)(A).

Before the Ninth Circuit issued a decision, three circuits had accepted this argument, three had rejected it, and one was split internally.  But a new decision settles the matter in the Ninth Circuit.  "[D]istrict courts may consider non-retroactive changes in sentencing law, in combination with other factors particular to the individual defendant, when analyzing extraordinary and compelling reasons for purposes of § 3582(c)(1)(A)." *United States v. Chen*, 48 F.4th 1092, 1098 (9th Cir. 2022).

## II. Duval's Case

### A.  Reasons for Reduction

Duval offers two "extraordinary and compelling" reasons to reduce his sentence:  nonretroactive changes in federal sentencing law, and his health.

8

### 1. Non-Retroactive Changes in Sentencing Law

Four non-retroactive changes in sentencing law are relevant to Duval's case. First, of course, is the anti-stacking amendment. If Duval were charged, convicted, and sentenced today for exactly the same conduct, his mandatory minimum consecutive sentence for two violations of § 924(c) would not be thirty years but ten. *See* 18 U.S.C. § 924(c)(1)(A)(i), (D)(i).

Second, on the drug counts, Counts 1, 2, and 3, one or more qualifying prior felony drug offenses subjected Duval to a mandatory minimum sentence of 10 years rather than five. See 21 U.S.C. § 841(b)(1)(B) & (viii) (eff. Feb. 18, 2000). That provision remains in place today, but the First Step Act altered the criteria a prior offense must meet in order to trigger the higher minimum penalty. The United States charged Duval with three qualifying prior offenses, all apparently involving possession without the element of intent to distribute. *See* 21 U.S.C. § 802(44) (eff. Feb. 18, 2000); Notice (Doc. 19); Presentence Report ¶¶ 52, 54, 55. Now, however, the prior offense must be a "serious drug felony," meaning, among other things, it must involve manufacturing, distributing, or possession with intent to distribute—not mere possession. *See* 21 U.S.C. §§ 802(57),[6] 841(b)(1)(A) & (viii) (eff. Dec. 21, 2018); *compare United States v. Rosales*, 516 F.3d 749, 758

---

[6] Two subsections are numbered (57). The second is intended here.

(9th Cir. 2008); *United States v. Rios-Beltran*, 361 F.3d 1204, 1209 (9th Cir. 2004). Duval's prior felony drug offenses would not elevate his mandatory minimum sentence today.[7]

Third, when Duval was sentenced, the guidelines were mandatory. The presiding judge, United States District Judge Richard F. Cebull, could not depart from the applicable guideline range unless he found an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *Koon v. United States*, 518 U.S. 81, 92–93 (1996) (quoting 18 U.S.C. § 3553(b)). At any sentencing, two issues had to be resolved. The first was the correct calculation of the guideline range. The second was whether any aggravating or mitigating circumstance took the case out of the "heartland" of the guidelines. *See Koon*, 518 U.S. at 95–96 (quoting and following *United States v. Rivera*, 994 F.2d 942, 949 (1st Cir. 1993) (Breyer, J.)). At Duval's sentencing, Judge Cebull found no circumstance taking the case out of the heartland. *See* Statement of Reasons (Doc. 262) at 3.

Finally, there certainly was a circumstance not taken into consideration by the Sentencing Commission: the thirty-year mandatory consecutive term imposed under § 924(c). But, at least in the Ninth Circuit, sentencing courts were

---

[7] The Information (Doc. 19) is not reflected in the presentence report, *see* Presentence Report ¶ 74, but it should have been.

prohibited from considering such a term when imposing a sentence under the guidelines. The theory was that varying downward on other counts *because* the court was also imposing a sentence under § 924(c) would, in effect, reduce the § 924(c) sentence below the minimum or make it partially concurrent. Sentencing courts therefore imposed two entirely separate sentences, one under the guidelines and another under § 924(c), viewing each as if the other did not exist. In 2017, the Supreme Court disapproved this approach in telling words. It held that § 3553(a) permits a district court to take account of a mandatory consecutive term under § 924(c) by varying downward on other counts[8] in order to arrive at "a *just* sentence" on the guidelines counts. *See Dean v. United States*, 581 U.S. 62, __, 137 S. Ct. 1170, 1176–77 (2017) (emphasis added).

In sum, at his sentencing hearing on October 22, 2002, Duval faced a mandatory minimum sentence of 40 years—ten years on Counts 1, 2, and 3, plus five years consecutive on Count 4, plus 25 years consecutive on Count 5. When determining the sentence on Counts 1, 2, 3, 6, 8, and 9, Judge Cebull was not permitted to consider the thirty-year consecutive sentence on Counts 4 and 5. Duval received a sentence of 570 months, or 47½ years. Were he sentenced today

---

[8] *Dean* referred to a downward variance on the predicate count, that is, the drug trafficking crime or crime of violence that constitutes an element of a § 924(c) violation. The reasoning of the decision, however, applies to a sentence on any other count or counts governed by the Sentencing Guidelines, whether they are predicate offenses for § 924(c) or not.

on the same charges for the same conduct, he would face a mandatory minimum sentence of 15 years—five years on Counts 1, 2, and 3, plus five years consecutive on Count 4, plus five years consecutive on Count 5.  He would face an advisory guideline range rather than a mandatory range.  And, when determining what sentence was "sufficient, but not greater than necessary" pursuant to 18 U.S.C. § 3553(a), the sentencing judge could consider the mandatory ten-year consecutive sentence on Counts 4 and 5 in deciding whether to impose a sentence greater than 60 months on Counts 1, 2, 3, 6, 8, and 9.

Given all these changes, it is highly unlikely that Duval would be sentenced to serve 210 months plus 60 months plus 300 months.  Nonretroactive changes in sentencing law create a wide and unwarranted discrepancy between Duval and others who commit the same crimes and have the same records and characteristics.

### 2. Duval's Health

Duval was 48 years old when he was sentenced to 570 months, or 47½ years, in prison.  He is now 68.  In 2011, he had double-bypass open heart surgery. He is currently being treated for hypertension and is monitored due to his history of heart failure.  He contracted COVID-19 in December 2020 and is now vaccinated, *see* Medical Records (Doc. 251-1) at 50–55, which gives him the best available protection against the disease.  Duval's hypertension and history of heart failure, however, increase his risk of developing severe illness if he should again

contract COVID-19. *See* Centers for Disease Control, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Dec. 6, 2022, and accessed Dec. 9, 2022). Compared to those aged 18 to 29, Duval is five times more likely to be hospitalized and 60 times more likely to die if he contracts COVID-19. *See* Centers for Disease Control, *Risk for COVID-19 Infection, Hospitalization, and Death by Age Group*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html (updated Nov. 8, 2022, and accessed Dec. 9, 2022).

As a prisoner, Duval of course remains subject to numerous other communicable diseases. The Bureau of Prisons manages its facilities to minimize their impact, but no densely populated facilities are foolproof against infection.

### 3. Conclusion

Congress believes there is something unfair or inapt about imposing dramatically longer sentences on defendants who are convicted of multiple § 924(c) counts in a single proceeding. It also believes that prior felony convictions for mere possession offenses should not elevate a defendant's mandatory minimum sentence for a federal drug offense. Duval did not benefit from these amendments. The Supreme Court believes sentencing judges must have discretion to depart or vary from the guideline range. Duval did not benefit from its decision. The

13

Supreme Court also believes a sentencing court must be permitted to take a mandatory consecutive sentence into account in fashioning "a just sentence" on counts subject to sentencing under the guidelines and the § 3553(a) factors. Duval did not benefit from that decision either. When it is so unlikely that a person exactly like Duval would today be sentenced to serve 47½ years in prison, his age and health concerns further magnify the disparity between him and other, similarly situated offenders.

Extraordinary and compelling reasons warrant a reassessment of the sentencing factors under 18 U.S.C. § 3553(a). *See Keller*, 2 F.4th at 1284.

## B.  18 U.S.C. § 3553(a)

Pertinent factors under § 3553(a) include the "nature and circumstances of the offense and the history and characteristics of the defendant," the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," to deter criminal conduct and protect the public, and to provide effective correctional treatment, including education or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1), (2). The Court may also consider the advisory guideline range and the need to "avoid unwarranted sentencing disparities" among similarly situated defendants and to provide restitution to victims. *See id.* § 3553(a)(4), (6)–(7).

14

### 1. Nature and Circumstances of the Offense

The criminal case began with a traffic stop. Duval was pulled over while driving his girlfriend, Converse's, vehicle. He provided a false name and was arrested for obstructing a peace officer. About two-thirds of a gram of 85% pure methamphetamine was found on his person. Converse consented to a search of the vehicle, which turned up additional methamphetamine in a container. Converse later testified that Duval also gave her methamphetamine before the traffic stop. On the back seat of the vehicle, officers found a loaded Bryco .380 pistol wrapped in a blanket.

In searching the residence Duval and Converse shared, as well as a storage unit, officers found supplies and equipment for manufacturing methamphetamine. In the master bedroom of the residence, they found a Mossberg pump-action 12-gauge shotgun.

Duval stood trial on a second superseding indictment. He was charged with one count of conspiring to manufacture methamphetamine, a violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); one count of possessing methamphetamine with intent to distribute it and one count of possessing the Bryco pistol in furtherance of that crime, violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1), respectively (Counts 2 and 4); one count of manufacturing methamphetamine and one count of possessing the Mossberg shotgun in furtherance of that crime,

15

violations of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c)(1) (Counts 3 and 5);

one count of possessing both the Bryco and Mossberg while being a fugitive from

justice, a violation of 18 U.S.C. § 922(g)(2) (Count 6); one count of being a felon

in possession of the Bryco, a violation of 18 U.S.C. § 922(g)(1) (Count 8); and one

count of being a felon in possession of the Mossberg, another violation of 18

U.S.C. § 922(g)(1) (Count 9).  All offenses were alleged to have occurred "[o]n or

about February 21, 2001."  Second Superseding Indictment (Doc. 103) at 2–5.

Converse and another co-defendant, Glasgow, testified against Duval at trial.

Glasgow said that Duval completed four "cooks," each producing about four

ounces of methamphetamine, for a total of one pound.  Due to the quantity of drugs

involved in Counts 1, 2, and 3—more than 50 grams of a mixture containing

methamphetamine—Duval was subject to a mandatory minimum penalty of five

years and a maximum of 40 years on the drug counts.

## 2.  History and Characteristics of the Defendant

Duval was 48 years old when he was sentenced.  His criminal history

category was VI, the highest available under the guidelines.  He was not designated

a career offender.  As previously noted, his scoreable prior controlled-substance

offenses appeared to involve possession but not intent to distribute.  *See* U.S.S.G. §

4B1.2(b) (Nov. 1, 2001); Presentence Report ¶¶ 54–57.  Congress views prior

offenses like most of Duval's as less serious than it did previously.

As Duval "refused to meet with the Probation Officer for a presentence interview," Presentence Report ¶ 64, the report does not include any information about Duval's mental and emotional health or his history of substance abuse. It provides only scant information about his personal and family history, his physical condition, and his education and employment history. *See* Presentence Report ¶¶ 65–71.

The Court is most concerned by Duval's first offense. It was committed in 1985, when he was 31 years old, and involved kidnapping and use of a knife. He received a sentence of five years. *See* Presentence Report ¶ 49. According to trial testimony, Duval told Converse he would use his firearms "if somebody came to rip us off or if we got busted." 3 Trial Tr. at 716:12–24. Yet Duval does not appear to have engaged in violent conduct since his first offense. When he was stopped by the officer at the outset of this case, he did not reach for the gun wrapped in a blanket in the back seat.

Duval seems to have employed deception and evasion rather than the violence his firearms threatened. He gave a false name to the officer who stopped him. *See* 1 Trial Tr. at 172:10–174:17. He used the same false name to rent a storage unit, and he even told his girlfriend to use the false name when talking to other people about him. *See id.* at 177:9–178:10, 251:2–252:9. He persuaded Converse to sign a false affidavit of common-law marriage in the hope that it

17

would prevent her from testifying against him. *See, e.g.*, 3 Trial Tr. at 610:11–611:5, 620:13–621:3. Duval was ordered to provide samples of his handwriting and refused to comply. *See* 2 Trial Tr. at 428:9–22. Converse testified that Duval had her make up a false document showing that she owned the Bryco. *See* 3 Trial Tr. at 656:12–23. Someone attempted to remove the serial number from the Mossberg shotgun. *See* 2 Trial Tr. at 365:24–368:10. Duval asserted at sentencing that the Mossberg had no serial number when Converse purchased it, but that still shows that he accepted a shotgun with no serial number.

Duval's conduct in his prior arrests and his disciplinary record in prison resonate discouragingly with these acts. Police reports indicate attempts at evasion or concealment in the presence of lawful authority. *See* Presentence Report ¶¶ 50, 53, 54, 57, 60–61; *see also* Addendum at 4–5 (not objecting to description of prior offenses). Most defendants who have applied to the Court for compassionate release have little to no disciplinary history. Duval has accumulated 18 violations since 2002, including one in 2021. *See* BOP Record (Doc. 250-3) at 1–5. But he appears to have lost good-conduct time on just one occasion, and the excessive length of his sentence must be taken into account here as well. Judge Friendly famously said, "[T]here is a human difference between losing what one has and not getting what one wants." *Greenholtz v. Inmates of the Nebraska Penal and Corr. Complex*, 442 U.S. 1, 10 (1979) (quoting Friendly, Henry, "Some Kind of

18

Hearing," 123 U. Pa. L. Rev. 1267, 1296 (1975)).  There is also a human

difference between an inmate who displays insolence or possesses prohibited items

when he has a few years left in his sentence and an inmate who does so in the face

of a release date in August of 2042, when he will be 88 years old.  Under Duval's

circumstances, a disciplinary record loses some veracity as an indicator of a

prisoner's ability and willingness to lead a law-abiding life.

On the whole, Duval's history and characteristics do not bode particularly

well for his success on supervised release.  He has repeatedly resorted to evasion,

concealment, or deception in the presence of lawful authority.  He can regain the

right to be left alone.  But he will have to prove that the things he wants to do no

longer involve criminal offenses.

### 3. Seriousness of the Offense, Respect for the Law, and Just Punishment

The most troubling aspect of Duval's offense was his procurement of the

two firearms.  He did this despite knowing he was not permitted to possess them at

all, and he did it because he knew that manufacturing methamphetamine made him

vulnerable.  Giving up meth would have solved the problem.  He chose instead to

stick with the meth and obtain guns as well.  He earned a lengthy sentence for drug

trafficking and possessing firearms in furtherance of it.  But a person who

distributed far more methamphetamine and harmed many more people would

19

probably not receive a sentence close to 570 months, even if he also possessed a firearm in furtherance of trafficking.

To date, Duval has served more than 21 years in jail or prison—254 months. A sentence of that length reflects the seriousness of his offenses and provides just punishment. Duval did, as the United States says, "possess two different firearms" to protect his drugs, yet it was all one course of conduct. The United States frequently charges one violation of § 924(c) when drug traffickers possess multiple firearms and/or engage in multiple transactions. Requiring Duval to serve 25 years in custody because the United States chose to charge him with two § 924(c) offenses instead of one makes the law appear subject to arbitrary manipulation. That appearance does not promote respect for the law.

### 4. General and Specific Deterrence

It was important to stop Duval from manufacturing methamphetamine. He has been stopped. Manufacturing methamphetamine is significantly harder than it used to be. Specific deterrence has been achieved. As for general deterrence, this District has seen a large number of drug-and-gun cases over the past 254 months since Duval received his sentence of 570 months. Long sentences do not appear to correlate strongly with general deterrence.

### 5. Training, Treatment, and Payment of Restitution

Duval's counsel states that he has taken educational courses in prison. *See* Br. in Supp. (Doc. 248) at 26. They should help him to lead a different life and better channel his energies. The Financial Unit's records show that he has paid the $800.00 special assessment but only $325.00 of a restitution obligation of $21,204.34. Again, however, a person who expects to spend the rest of his life in prison may not perceive the importance of paying restitution as a means of showing his commitment to rejoining society as an integral member of it.

### 6. Unwarranted Disparities

The evidence showed that Duval was significantly more culpable than his co-defendants. Converse was named as a defendant in Counts 1–5 and 7. Glasgow was named in Counts 1, 3, and 7 of a superseding indictment. Both of them entered into plea bargains and testified against Duval at trial.

But Converse and Glasgow were fully participating co-conspirators. They obtained the precursors Duval needed, including stealing about 20,000 pseudoephedrine tablets by Glasgow's estimate. *See, e.g.*, 4 Trial Tr. at 706:5–10. Converse obtained firearms for Duval, despite knowing he could not have them. Both pled guilty to just one count, misprision of a felony. Converse received a sentence of 27 months, Glasgow 36 months.

Had Converse been convicted at trial as charged, whether directly or on an

aiding-and-abetting or *Pinkerton* theory, presumably[9] the United States would have

sought a sentence of at least 420 months—the five-year minimum applicable to her

under Counts 1, 2, and 3, plus five years on Count 4 and 25 years on Count 5.[10]

The disparity between Converse's and Glasgow's guideline sentences and Duval's

guideline sentence of 210 months was warranted in view of Duval's significantly

greater culpability.  But the disparity between 570 months and 36 or 27 months is

irrational.  The 300-month term on Count 5, in particular, appears from this

perspective to be a surcharge on Duval's exercising his right to a jury trial.

Finally, nonretroactive changes in sentencing law created an unwarranted

disparity between Duval and other offenders who have committed similar and even

more serious offenses but will face mandatory minimum consecutive sentences of

five or ten years rather than thirty.  Duval was also condemned to serve his 210-

month guideline sentence with no account taken of his thirty-year mandatory

consecutive term.  The United States makes no attempt to justify this wide,

multifactor disparity.  The Court cannot conceive of one.

## C. Conclusion

Duval was the driving force behind serious offenses.  He posed a significant

---

[9] *See, e.g.*, Judgment (Doc. 187) at 2, *United States v. Hungerford*, No. CR 03-74-BLG-RFC (D. Mont. Sept. 30, 2005); Judgment (Doc. 425) at 2, *United States v. Garcia*, No. CR 04-87-BLG-RFC (D. Mont. Nov. 23, 2005).

[10] Duval was permitted to point out some but not all of these facts in cross-examining Converse at trial. *See* 3 Trial Tr. at 661:9–666:17.

danger to society, not just because he manufactured and distributed methamphetamine, but because it was important to him to be armed and prepared to use violence. The United States proved that he earned a lengthy sentence.

But the United States did not prove that Duval posed or now poses a greater danger to society than dozens of other offenders who are convicted of very similar offenses and yet receive much shorter sentences. The United States points out that Duval "operat[ed] a methamphetamine lab in his residence at a time when methamphetamine production still occurred locally in Montana." U.S. Resp. (Doc. 250) at 22. Neither the statute nor the guidelines treat manufacturing as a more serious offense than possession with intent to distribute. The quantity is the key. Duval manufactured one pound, far less than many others who have been convicted of both drug trafficking and one § 924(c) violation, despite having multiple firearms.

The time Duval has served reflects the seriousness of his offenses and provides just punishment. He is now 68 years old. He has served a small portion of his time under the threat of a global pandemic. The graver point is that he has served all of his time believing he will probably not live long enough to be released. Reducing his sentence to time served will negate the unwarranted disparity between his 570-month sentence and the sentences typically received by defendants whose records and conduct are similar to his.

23

18 U.S.C. § 3582(c)(1)(A) authorizes imposition of a "term of . . . supervised release . . . that does not exceed the unserved portion of the original term of imprisonment." Duval's sentence entails a five-year term of supervised release. *See* Judgment (Doc. 190) at 5. The Court finds that his criminal history and his habit of deception and evasion warrant a longer term. In addition, he must "step down" from his prison sentence by serving one year of supervised release in a prerelease center. Duval must understand that any violation of a condition of his release, even if it seems unimportant to him, may result in his return to prison.

Accordingly, IT IS ORDERED:

1. Duval's motion to reduce the sentence under 18 U.S.C. § 3582(c)(1)(A)(i) (Doc. 247) is GRANTED.

2. Pursuant to the original judgment and 18 U.S.C. § 3582(c)(1)(A), the total term of supervised release shall be **ten (10) years**.

3. This Order is STAYED for up to 60 days.

4. The United States Probation Office must verify Duval's residence and establish a release plan with a provision for placement in a prerelease center for at least 12 months. Appropriate travel arrangements must also be made.

5. Duval shall be released on the earlier of the following dates:

   a.   when the Probation Office is satisfied that the requirements of paragraph four are met; or

24

b.    seventy (70) days from the date of this Order.

6. If more than 60 days are needed to accomplish Duval's release, the United States must so notify the Court and demonstrate good cause why the stay of this Order should be extended.

7. The United States Probation Office shall review Duval's conditions of supervised release.  If modifications are needed, the Probation Office shall notify counsel for both parties.

8. Duval must provide the Court with the complete address where he will reside upon release.

9. The pending motion to appear pro hac vice (Doc. 260) is DENIED AS MOOT.

DATED this _9th_ day of December, 2022.

Susan P. Watters
United States District Court